**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IGT GLOBAL SOLUTIONS CORPORATION**, a Delaware corporation; | ) ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY DEMAND** |
| **COLIN HADDEN**, an individual; **CAMELOT ILLINOIS, LLC**, an Illinois limited liability corporation; and **CAMELOT GLOBAL SERVICES (NORTH AMERICA), INC.**, a Delaware corporation, | ) ) ) ) ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff IGT GLOBAL SOLUTIONS CORPORATION, formerly GTECH Corporation (hereinafter and collectively, "IGT"), for their Complaint for Injunctive and Other Relief against Defendants COLIN HADDEN ("Hadden"), CAMELOT ILLINOIS, LLC ("Camelot Illinois") and CAMELOT GLOBAL SERVICES (NORTH AMERICA), INC. ("Camelot") (collectively with Hadden and Camelot Illinois, "Defendants"), states as follows:

## BRIEF NATURE OF THE ACTION

1.      This is an action for breach of contract, actual and/or threatened misappropriation of trade secrets under the Illinois Trade Secrets Act and the Defend Trade Secrets Act, unfair competition, and tortious interference with contract. IGT seeks preliminary and permanent injunctive relief in addition to other relief.

2.      IGT is one of the leaders in the private and public management of state-run lotteries across the United States. In addition, IGT is a leader in the design and manufacture of lottery games, including paper, electronic, and video terminal gambling games. Until recently,

IGT, along with its joint venture partner, was the only company in the United States with any experience in operating lottery management agreements ("LMAs").

3.      Until November 2, 2017, Hadden served as a high-level executive for GTECH Indiana, LLC (later rebranded as IGT Indiana). In his position, Hadden served not only as the senior most individual in IGT Indiana, but also served on significant and numerous internal teams for IGT. In this position, Hadden had access to and helped devise the corporate sales and marketing strategies for IGT Indiana and IGT and Hadden is intimately aware of and uniquely positioned to unfairly compete against IGT.

4.      Indeed, until recently, Defendant Hadden was one of only a small handful of individuals with experience running an LMA.

5.      Beyond this role, however, Hadden was also tasked by IGT with helping IGT design its nationwide strategy, including identifying states in which to pursue LMAs, helping design new and innovative games and places in which to target the dissemination and sale of such games, and being involved in IGT's strategies relating to placing lottery games in various private businesses. All of these initiatives are highly confidential within IGT and are not publicly known.

6.      In this role and because of his duties and responsibilities, IGT provided Hadden with access to its most secret information, including: (a) intimate knowledge of IGT's annual business planning process for the LMA organizations, as well as existing IGT FM customers; (b) detailed plans for retailer incentive programs; (c) retail expansion opportunities; (d) IGT lead industry initiatives (i.e. e-commerce, cashless and other initiatives) for channel expansion; and (e) targeted growth retailer SWOT analysis and planning for key retail chains. IGT provided Hadden with access to strategic and tactical plans for all of the key retail chain target accounts,

as well as the business cases used to support selling in lottery programs to these major retail players. Since Indiana and Illinois share a significant number of the top retail chain accounts in the Midwest, the information Hadden gleaned to support retail chain strategic initiatives could be used for the benefit of Camelot in Illinois and to the disadvantage of IGT in Indiana.

7.      Put simply, Hadden was an extremely high-level employee within IGT, who, based on his position, was exposed to IGT's most sensitive trade secrets and confidential information, including its strategic and tactical operation information pertaining to LMAs. Because of this access, Hadden executed an 18-month non-compete agreement with IGT upon the start of his role with IGT Indiana in March 2014.

8.      In November 2017, Hadden announced, abruptly, that he was leaving IGT to take a position with Camelot Illinois, and would be running Camelot Illinois's management of the Illinois lottery through an LMA. Camelot Illinois began operating the Illinois Lottery on January 1, 2018. Prior to January 1, 2018, Northstar Lottery Group, LLC, a joint venture in which IGT is the controlling member, ran this lottery.

9.      While Hadden is barred from taking this employment based on his IGT non-compete agreement, IGT is particularly concerned with Hadden's employment because it recently learned that Hadden misappropriated its trade secrets.

10.     Indeed, in performing a forensic review of Hadden's IGT computer following his departure, IGT learned that Hadden inserted six different external media devices into his IGT computer in the months before his resignation. Even more concerning, however, two days after he resigned and after he purportedly "forgot" to return his IGT computer, Hadden inserted and downloaded additional materials onto an external media device.

11.     Moreover, when confronted about having IGT's information, Hadden denied it

3

and provided an affidavit saying as much.

12.     Given his competitive employment and the inaccurate statements he made, IGT is particularly concerned that Hadden intends to utilize IGT's trade secret and confidential information to better position Camelot not only in Illinois, but also around the rest of the United States.

13.     Camelot and Camelot Illinois now seek to utilize IGT's head start in this area and seek to erode IGT's standing in the market by hiring one of its business leaders. Indeed, the knowledge and information that Hadden possesses would enable Defendants to save millions of dollars in start-up costs and erode IGT's trade secrets, confidential and proprietary business information, customer relationships, and goodwill. Most troubling, Camelot and Camelot Illinois are keenly aware that Hadden is bound by various restrictive covenants contained in his IGT employment agreement and, despite this, seek to place him in a role in the LMA space that directly violates the restrictive covenants contained within his Restrictive Agreement (the "Agreement").

14.     In his position with Camelot Illinois, Hadden has disclosed or will disclose IGT's trade secrets and confidential and proprietary information to Camelot Illinois and Camelot for Defendants to improperly compete in the lottery space and to expand into markets in which Hadden accessed and possesses IGT's trade secrets about IGT's strengths and weaknesses, competitive plans, and strategies. This information was specifically disclosed to Hadden and Defendants have used or will use these trade secrets and confidential information to unfairly compete against IGT.

15.     Accordingly, IGT seeks to preliminarily and permanently enjoin Hadden from using and continuing to use IGT's trade secret information and from interfering with IGT's

4

customer and employee relationships through his further use and disclosure of IGT's trade secret and confidential information. In addition, IGT seeks to preliminarily and permanently enjoin Hadden from his ongoing breach of certain reasonable post-employment contractual obligations owing to IGT.

16.     Absent such injunctive relief, IGT faces irreparable injury, including the loss of customers and referral sources, its competitive advantage, its trade secrets, and its goodwill in amounts which may be impossible to determine unless Hadden is enjoined and restrained by order of this Court.

17.     IGT also seeks monetary damages for the amount of its lost business and for the value of its misappropriated trade secrets, to the extent such damage is identifiable.

## PARTIES

18.     IGT Global Solutions Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Providence, Rhode Island. IGT was formerly known as GTECH Corporation, with the change in name the result of a merger transaction, which closed on April 7, 2015.

19.     Camelot Global Services (North America), Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. Camelot is the managing member of Camelot Illinois and, on information and belief, is the sole member of Camelot Illinois.

20.     Camelot Illinois, LLC is a limited liability corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

21.     Colin Hadden was employed by IGT Indiana, starting in March 2014 until November 2, 2017. Hadden is bound by a non-compete agreement with IGT. He is domiciled in and, on information and belief, a resident of Chicago, Illinois.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331, because IGT's DTSA claim against Hadden, under 18 U.S.C. §1836, *et seq.*, raises a federal question. This Court also has supplemental jurisdiction over IGT's state law claims under 28 U.S.C. §1367(a), in that those claims are so related to IGT's federal claim that they form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.S. §1391(a), because Defendants have committed and continue to commit tortious acts in this State. Additionally, IGT regularly conducts business in Illinois.

## EVENTS GIVING RISE TO THIS ACTION

### IGT's LOTTERY BUSINESS

24.     IGT and its affiliated entities collectively form the world's largest end-to-end gaming company, with leading market positions in North America, and the most extensive gaming content library in the world. IGT operates and provides an integrated portfolio of innovative technology products and services across all gaming markets, including: lottery management services, online and instant lotteries, instant ticket printing, electronic gaming machines, sports betting, and interactive gaming.

25.     Leveraging a wealth of premium content, substantial investment in technology, in-depth customer intelligence, and operational expertise, IGT's solutions anticipate the demands of consumers wherever they decide to play, providing its customers with leading edge solutions.

26.     IGT and its affiliated entities supply a unique set of lottery solutions to more than 100 customers worldwide. As a result of the various revenue streams that government-sponsored lotteries provide, many governments have become increasingly dependent on their lotteries from lottery ticket sales, which often serve a significant source of funding for these programs.

6

27.     IGT provides lottery goods and services in a variety of contractual arrangements, such as facilities management contracts, concession or operator contracts, and product sales contracts.

28.     In the majority of jurisdictions, lottery authorities award contracts through a competitive bidding process. Typical service contracts are five to 10 years, with multi-year extension options. After the expiration of the initial or extended contract term, a lottery authority generally may either seek to negotiate further extensions or commence a new competitive bidding process.

29.     IGT also designs, sells, and operates a complete suite of point-of-sale terminals that are electronically linked with a centralized transaction processing system that reconciles lottery funds between the retailer—where a transaction occurs—and the lottery authority—where the wager is captured.

30.     Additionally, IGT also specializes in producing high-quality instant ticket games and provides printing services, such as instant ticket marketing plans and design, programming, warehousing, packaging, shipping, and delivery services.  IGT's products and services are used in interstate commerce throughout the United States and elsewhere.

31.     IGT further has developed and continues to develop new lottery games, licenses new game brands from third parties, and installs a range of new lottery distribution devices, all of which are designed to drive responsible same-store sales growth for its customers.

32.     To best drive sales, IGT works closely with its lottery customers and retailers to help retailers sell lottery games more effectively. These programs include product merchandising, display recommendations, selection of appropriate lottery product mix for each location, and account reviews to plan lottery sales growth strategies.

33.     The lottery business is highly competitive and typically subject to strong price-based competition. While Camelot is an international player in the lottery management industry, until winning the Illinois Lottery contract earlier in 2017, it had no presence in the United States.

34.     In the United States, lottery agreements typically come in one of two forms: (1) facilities management contracts ("FMCs") and (2) lottery management agreements ("LMAs").

35.     An FMC typically requires IGT to construct, install, and operate the lottery system for an initial term, which is typically five to 10 years. Under a typical FMC, IGT maintains ownership of the technology and facilities, and is responsible for the capital investments throughout the duration of the contract. FMC revenues are generally service fees paid to IGT directly from the lottery authority based on a percentage of such lottery's ticket sales. Under a number of IGT's FMCs, IGT provides an additional wide range of support services and equipment for the lottery's instant ticket games, such as marketing, distribution, and automation of various systems. IGT provides FMC services in 21 different states, currently.

36.     For LMAs, typically, IGT manages the core lottery functions, including the lottery systems and the majority of the day-to-day activities along the lottery value chain that in the FMC paradigm are the responsibility of the lottery authority. This includes managing accounting and other back-office functions, running advertising and promotions, employing sales personnel to grow the lottery retailer base, and designing strategic annual business plans to responsibly and effectively grow sales, all under the supervision and control of the lottery authority. Most LMAs also include a separate supply agreement, through which IGT provides certain hardware, equipment, software, and support services, similar to those provided under FMCs. Under these types of agreements, IGT earns service revenues that are generally fixed based on the percentage of wagers.

37.    In Illinois (until January 1, 2018) and New Jersey (currently), IGT provides lottery management services as part of a joint venture, and in Indiana through IGT Indiana, a wholly-owned subsidiary of IGT. Illinois, Indiana, and New Jersey are currently the only states in the United States that operate under an LMA.

38.    In addition to earning revenue through FMCs and LMAs, IGT also enters into instant ticket printing contracts, product sales contracts, and the design and manufacture of gaming machines, video lottery terminals, and designing game content.

39.    IGT also offers a wide array of gaming systems, sports betting, interactive and social betting, and various additional gaming products.

40.    Through these various products and offerings, IGT has emerged as the preeminent North American and global leaders in lottery management, product and machine design, and game offerings.

### HADDEN'S EMPLOYMENT WITH IGT INDIANA

41.    Hadden was employed by GTECH Indiana starting in March 2014 until November 2, 2017.

42.    On or around April 7, 2015, while Hadden was employed by GTECH Indiana and bound to an agreement with GTECH, GTECH acquired through merger International Game Technology, the world's largest slot machine manufacturer. Following the acquisition, GTECH changed its corporate name to IGT. As a result of that merger, Hadden's employment was transferred from GTECH Indiana to IGT Indiana, and his Agreement was transferred from GTECH to IGT.

43.    Hadden was hired to serve as the Chief Operating Officer for GTECH Indiana, and continued to serve in that role after GTECH's acquisition of IGT and subsequent name change.

44.     As the COO of IGT Indiana, Hadden served as the highest ranking operations member in that organization.

45.     In Indiana, based on the structure of the LMA, Indiana-state lottery officials serve as the final decision maker, but IGT Indiana is responsible for handling all of the day-to-day sales, marketing, and strategy for the state. In that role, IGT Indiana essentially serves as the agent in an agent-principal relationship with the Indiana lottery retaining the authority to direct or countermand IGT Indiana's decisions.

46.     Based on this relationship, Hadden was essentially responsible for, and provided strategic and tactical direction to a $1B business.

47.     In this position, Hadden reported directly to senior management at IGT.

48.     Because of this, Hadden participated in IGT's Annual Executive Leadership Meetings, where strategies and tactics from around all of IGT's businesses are shared with the Executive Management team. In addition, because of his position, Hadden had access to technology white papers, from IGT's Chief Technology Officer, providing insights and potential uses of upcoming IGT advancements across IGT's business platforms. Further, and again based on his IGT position, Hadden participated in operational planning meetings, through which IGT developed efficiency plans to provide IGT a competitive advantage in upcoming bids and ongoing business opportunities.

49.     Additionally, in his role, Hadden served an extremely important function within IGT's LMA space, serving as both the COO of IGT Indiana and as a key employee in driving the overarching strategies of IGT in the LMA space. In particular, Hadden has: (a) intimate knowledge of IGT's annual business planning process for the LMA organizations, as well as existing IGT FM customers; (b) detailed plans for retailer incentive programs; (c) detailed

knowledge about IGT's retail expansion opportunities; (d) detailed knowledge about IGT's lead industry initiatives (i.e. e-commerce, cashless and other initiatives) for channel expansion; and (e) IGT's targeted growth retailer SWOT analysis and planning for key retail chains.

50. IGT provided Hadden with access to strategic and tactical plans for all of the key retail chain target accounts, as well as the business cases used to support selling in lottery programs to these major retail players. Since Indiana and Illinois share a significant number of the top retail chain accounts in the Midwest, the information Hadden gleaned to support retail chain strategic initiatives could be used for the benefit of Camelot in Illinois and to the disadvantage of IGT in Indiana.

51. Specifically, as it related to IGT Indiana, Hadden oversaw individuals who ran the marketing, sales, and game development. Hadden was heavily involved in all decisions made by these internal IGT Indiana departments.

52. Indeed, as an example of Hadden's involvement, he engaged in advanced reporting of marketing developments, provided approval of art for marketing, and worked directly on IGT Indiana's development of new games.

53. Hadden also was directly involved in preparing and presenting IGT Indiana's annual business plan to the lottery authority in Indiana, the State Lottery Commission of Indiana. The processes behind the development of such annual business plans were highly confidential and proprietary to IGT and IGT Indiana.

54. Importantly, while IGT will work with individual states to develop various lottery games (such as scratch-off tickets or video gambling), IGT directs such efforts toward more than one state. In other words, individuals like Hadden, would be tasked with helping developing games at a state-level, but would also work with others within IGT to develop strategies for mass

dissemination of such games.

55.     This is because, in addition to IGT managing lotteries, it also develops game systems and owns a printing press, through which it prints and disseminates its scratch-off games. The number of companies offering these services are extremely limited in the lottery-management market.

56.     As a result, IGT and its state-level counterparts are part of broad-based, strategic initiatives that determine not just lottery management, but game sales and development. Hadden was directly involved in these initiatives and conversations, all of which are treated as highly confidential by IGT.

57.     For example, Hadden worked with a team to develop a new combination scratch-off/draw game, which IGT intends to be a global game, but which is being tested in Indiana. It took IGT eight months to develop this game, and Hadden was directly involved in IGT's development of this game.

58.     Additionally, because of the nature of IGT's nationwide business, Hadden was directly involved with and part of various strategy teams tasked with identifying opportunities in other states on the LMA side.

59.     For example, because Indiana is one of only three states in which IGT operates an LMA, Hadden was part of a team engaged in constantly discussing best practices, insights, strategies, and analytics associated with operating an LMA in Illinois, Indiana, and New Jersey.

60.     Importantly, IGT has used Indiana as a test bed for many creative pilot programs such as proximity marketing, retailer route services, retailer mobile app co-op programs to name a few. Process, implementation details, and business case analyses are not publicly available and would be detrimental in the hands of a competitor, such as Camelot or Camelot Illinois.

61.     Moreover, because Northstar Illinois (the joint venture in which IGT participated that managed the Illinois State Lottery before Camelot Illinois) began operating before IGT Indiana, the Northstar Illinois business plan and operational playbook was used as training materials for the Indiana team, including Hadden. As a result of this, Hadden not only knows the most intimate IGT details about IGT's work in Indiana, but possesses the same or similar information about how IGT managed Illinois, as well. In other words, Hadden essentially has walked into his position in Illinois possessing Northstar Illinois's best practices from IGT's time on the ground in Illinois.

62.     Further, some of these corporate-wide strategic initiatives in which Hadden was directly involved included discussions about expanding IGT's LMA programs, the overarching structure of the LMAs, how to best negotiate terms for LMAs, and corporate-wide strategies for introducing new games at a statewide level through various lottery terminals.

63.     As well as the above projects, Hadden was also involved in defining strategy as it relates to IGT's efforts to place lottery machines into certain national chain retail stores. The negotiations involved in landing these sorts of contracts often take several years, and Hadden is aware of and was involved at a high level with such negotiations. As a result, Hadden knows IGT's targets, machine specifications for use at various targets, and other contract details.

64.     Specifically, IGT provided Hadden access to its annual Retail Strategic Plan, which details IGT's market opportunities with chain retailers across a spectrum of channels, dovetails IGT's technology roadmap to identify and quantify the size of each opportunity, and provides a product and business-model roadmap for growing and/or obtaining each opportunity.

65.     As a byproduct of this, Hadden is intimately aware of IGT's targeted growth retailer SWOT analysis and pitch planning for those retail chains that IGT has identified as key

targets. Each of these targets is applicable to the Illinois market, as well as elsewhere nationwide.

66.     Furthermore, because of the nature of the lottery play of residents of Illinois and Indiana, Illinois players often cross into Indiana and vice versa to purchase lottery tickets. As a result, the Hoosier Lottery, which IGT Indiana manages, and the Illinois Lottery, which Camelot Illinois commenced management of on January 1, 2018, directly compete for the same players. Hadden was directly involved in such marketing discussions and strategic initiatives to attract Illinois patrons into Indiana and to keep Indiana patrons from crossing over into Illinois to purchase lottery tickets.

67.     Finally, Hadden participated on IGT's behalf at a number of key trade shows, where IGT showcased future technology concepts. While some of these technology concepts were presented publicly, a number of these presentations were made privately, with the purpose of obtaining market feedback, for designing or retooling its technology concepts. Such strategic customer feedback helped IGT identify market needs, and prioritize that which was essential to IGT's current and future bids and existing customer growth planning. Consequently, such information was only made available to the highest levels of IGT management, such as Hadden.

68.     In his position, Hadden was responsible for:

   a.   managing the customer relationship and understanding the nuance of GR [?]

   b.   managing the teams responsible for developing sales and marketing strategy;

   c.   working as part of a team to develop and define strategic sales and marketing strategies for various scratch-off and draw games;

   d.   developing the sales and marketing team for IGT Indiana, by both staffing and attracting talent to the marketing team;

   e.   working directly with IGT leadership to build strategies to engage customers and potential customers; and

   f.   helping to develop IGT Indiana's and IGT's strategic plan.

69.     Based on his role and responsibilities, Hadden had direct knowledge of and helped devise IGT's and IGT Indiana's (a) pricing; (b) strategic plans; (c) customer retention strategies; (d) its marketing of plans; (e) product development strategies; and (f) product release strategies.

**IGT'S CONFIDENTIAL AND PROPRIETARY INFORMATION**

70.     In his role and as discussed above, Hadden worked directly with all aspects of IGT's lottery business. As a result of this work, he knows IGT's:

      a.  pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, bulk purchase pricing, etc.;

      b.  competitive strategies against its competitors, including Camelot;

      c.  customer retention strategies, including strategies for withstanding competitive pressure from companies like Camelot;

      d.  product development strategies, research and development plans and strategies;

      e.  marketing strategies, including its market share, product mix share, its innovation strategy, and market research; and

      f.  IGT's strategic long-term plan, which Hadden, along with others, helped develop.

71.     Additionally, given his position, Hadden had access to information about IGT's other non-LMA customers.

72.     Given Hadden's unique position within IGT, he has intimate knowledge of its financing, pricing, margins, knowledge of IGT's contracts, knowledge of its product development strategies, release plans, and marketing initiatives for those products, and knowledge of its customer and potential customer strategies.

73.     This information is treated as highly confidential within IGT and is not easily or cheaply duplicated by a new market entrant, such as Camelot or Camelot Illinois. Further,

Hadden knows IGT's market strengths and weaknesses.

74.     Moreover, because Camelot Illinois and Camelot are new market entrants, they do not have such information on their own, and will have no choice but to rely heavily on Hadden's knowledge of IGT's trade secret information.

75.     IGT's confidential information discussed above is not available to the public, is of great value to and would give any of its competitors who acquired such information, including Camelot and Camelot Illinois, an unfair competitive advantage.

76.     IGT and IGT Indiana require that their information be kept strictly confidential by its employees and restricts access to this information. IGT takes specific and rigorous measures to preserve the confidentiality of this information, including but not limited to, the following:

(a)     requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return its property upon termination;

(b)     requiring its employees to maintain confidentiality of its information and protect its assets;

(c)     prohibiting the use of its materials not directly related to its business, or the removal or borrowing of its property without permission;

(d)     using badge IDs to restrict access to and within its facilities to which Hadden had access;

(e)     prohibiting the use of its computer systems for non-company purposes;

(f)     restricting access to its computerized information through the use of passwords;

(g)     prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

(h)     also restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

77.     IGT took great measures to protect such information. At IGT, this information is stored on IGT's secure, proprietary electronic database, which is password protected and subject

16

to manual password updates by an individual user periodically, subject to numerous firewalls, only accessible on-site at IGT or through a pre-approved IGT VPN. Additionally, not everyone within IGT is provided access to this information.

78.     To ensure that IGT's employees were aware of these security protocols, information security awareness training and materials were provided to IGT's employees on at least an annual basis and all new employees received this training during the onboarding process.

79.     Additionally, IGT took explicit steps at termination to ensure that its trade secrets did not remain in the possession of a former employee, such as with Hadden, including, but not limited to: (a) requiring all ID badges, access cards, and keys be returned; (b) disabling all system access and associated user IDs; (c) collecting all company-owned electronic media; (d) collecting all company-owned intellectual or physical property; (e) revoking all physical and logical access rights; (f) requiring disclosure of all third party and hosted systems accessed by the former employee and requiring the employee to revoke or turn over such systems to IGT; and (g) removing email and voicemail access.

80.     All of these security measures were taken by IGT for the purpose of protecting its trade secret and confidential information.

81.     IGT's trade secrets and confidential and proprietary information would give a competitor an advantage by not expending the time and resources to develop the trade secret and confidential and proprietary information as IGT has done; quickly developing products and services to unfairly compete with it in order to diminish its head start; alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

### HADDEN'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO IGT

82.     On March 12, 2014, Hadden executed the Agreement that contains certain reasonable post-employment contractual obligations owing to IGT. A true and correct copy of

the Agreement is attached as Exhibit A.

83. Hadden's employment, access to and receipt of IGT's and IGT Indiana's trade secrets and confidential information, and other compensation and benefits were all expressly conditioned on his execution of the Agreement.

84. If Hadden failed to execute the Agreement, he would not have received employment or access to IGT's confidential information. (See Exhibit B, December 9, 2013 Offer Letter).

85. Indeed, the employment offer explicitly was conditioned on Hadden's execution of the Agreement, as the December 9, 2013 letter states: "This offer of employment, and continuation of your employment with GTECH, is subject to and contingent upon the following: (1) Execution of a non-disclosure and non-competition agreement, in favor of GTECH, prior to commencement of employment." (Ex. B.)

86. Hadden's Agreement defines such information that constitutes "Confidential information" as: "all non-public information, oral or written, and materials (in any medium), including trade secrets, of which Employee becomes aware as a result of or in the course of Employment which could reasonably be understood to be confidential, whether or not so marked, and is related to the Company's business and all other information or data identified as proprietary or confidential at the time of disclosure." (Agreement at § 2.)

87. Hadden also specifically agreed that he: "shall never directly or indirectly use or disclose, and shall take all reasonable steps to prevent others from using or disclosing any information, discovered or acquired by [Hadden] during or by virtue of Employment, which relates to the Company, its Services or Products …." (Id.)

88. The Agreement defines "Services and Products" to mean: "All gaming systems

18

and equipment and all other products and services which the Company markets or provides or which to Employee's knowledge the Company plans to market or provide. (Id. at §1.)

89.     In addition to prohibiting the disclosure of IGT's confidential information, the Agreement contains narrowly tailored post-employment restrictive covenants, which are designed to protect its goodwill, long-standing customer relationships and employee relationships, in addition to its confidential information.

90.     Specifically, Hadden agreed that during the course of his employment with GTECH, and subsequently IGT Indiana, and for 18 months after the termination of his employment for any reason, he would not: "directly or indirectly engage in any activity (if such activity is reasonably related to any activity engaged in by Employee as an employee of the Company) in conjunction with and to the benefit of any business or endeavor which is reasonably deemed by [IGT] to be, or about to be in competition with Services and Products anywhere in the world where [IGT] is then doing or pursuing business or is to Employee's knowledge about to do or pursue business." (Id. at §4.)

91.     The Agreement further prohibits Hadden, for a period of three years after his employment ended, from "disturb[ing] any business relationship between [IGT] and its employees, dealers, customers, suppliers or other business associates." (Id.)

92.     In executing his Agreement, Hadden also agreed that "duration, territorial and other restrictions set forth herein are … reasonable to protect [IGT's] business interests." (Id. at §7(c).)

93.     The Agreement contains a Rhode Island choice-of-law provision (Id. at §7(g).)

94.     Lastly, Hadden agreed that the Agreement "shall be binding upon and inure to the benefit of GTECH[,] its legal representatives and permitted assigns upon Employee", and further

19

agreed that "[t]his Agreement shall be assignable by the Company in whole or in part, to any successor to substantially all of any major portion of the Company's business." (Id. at §8(a) & (b).)

<u>**HADDEN'S POST-RESIGNATION ACTIVITIES & EMPLOYMENT WITH CAMELOT.**</u>

95.     On November 2, 2017, Hadden told IGT's CEO, Michael Chambrello, that he was resigning his position with IGT Indiana to take a job with Camelot Illinois, and would be in charge of running the Illinois lottery.

96.     While Hadden offered two weeks, because he was taking a position with a competitor, IGT Indiana accepted Hadden's resignation, effective immediately.

97.     Around the same time, Hadden told Melissa Pursley, IGT Indiana's Vice President of Marketing and Product Development, that Hadden would be both leading Camelot Illinois, but also reporting to a higher level within Camelot. During that conversation, Hadden told Pursley that Hadden would be "number 3 in the organization."

98.     On November 3, 2017, Hadden returned some, but not all of the IGT property in his possession. Specifically, on November 3, Hadden returned the IGT iPad, iPhone, printer, paperwork, monitor, and company car key in his possession. At the time, Hadden claimed that he forgot to bring his IGT laptop.

99.     The following day, Saturday, November 4, 2017, Hadden drove to the home of Tracy McNutt, IGT Indiana's Deputy General Manager, to drop off his company-assigned laptop, and the spare key to his company car. The laptop remained in Ms. McNutt's custody until Monday, November 6, 2017, at which time she shipped the device to IGT.

100.     At no time did Hadden return any external media devices, such as a thumb drive or external hard drive.

101.     In the weeks that followed, IGT Indiana employees and others associated with the

Hoosier Lottery received numerous calls from Hadden. In those calls, Hadden informed them that he had taken a position with Camelot and was living in Chicago.

102.    Based on what IGT viewed as a direct violation of Hadden's non-compete agreement, on November 17, 2017, IGT sent Hadden a cease-and-desist letter. A true and correct copy of the cease and desist letter is attached as Exhibit C.

103.    This cease and desist letter was also sent to Camelot.

104.    On November 27, 2017, Camelot Illinois and Hadden, through counsel, responded to the cease and desist letter. In the letter, amongst other things, Hadden signed a certification indicating that he did not possess IGT's trade secret or confidential information. A true and correct copy of Hadden's response is attached as Exhibit D.

105.    However, despite Hadden's assurances, based on a forensic examination performed on Hadden's IGT laptop, IGT has reason to believe that Hadden's assurances were false.

106.    Indeed, based on IGT's forensic review of Hadden's IGT computer, it uncovered high intensity USB device usage in the two months prior to his resignation. That use is as follows:

> a.  On November 4, 2017, two days after his resignation and the day after he purportedly returned IGT's property, Hadden inserted a USB Flash Disk device, bearing Serial No. FBK1410163303856, into his IGT computer.
>
> b.  On September 25, 2017, Hadden inserted a Hitachi USB device, bearing Serial No. 21001207250B000002367, into his IGT computer.
>
> c.  That same day, also on September 25th, Hadden inserted a WD Elements device, bearing Serial No. 575832314336325534313532, into his IGT computer.
>
> d.  On September 22, 2017, Hadden inserted another USB device, bearing Serial No. 041515000000079E6, into his IGT computer.
>
> e.  On September 7, 2017, Hadden inserted both the Hitachi and WD devices into his computer.

21

      f.   On August 22, 2017, Hadden inserted two separate USB devices into his IGT computer, one bearing Serial No. 0415150000006DA6, and the second bearing Serial No. 04140800000432E3.

107. Prior to Hadden beginning to use six different external media devices in August 2017, Hadden had not inserted an external media device into his computer since July 2016. In other words, Hadden was not a regular user of external media devices on his IGT computer until the two months preceding, and immediately following, Hadden's acceptance of an offer of employment with Camelot Illinois.

108. Unfortunately, without Hadden returning these external media devices, it is impossible for IGT to know what documents he downloaded onto these devices, but IGT's subsequent investigation, after learning about Hadden's improper competition and computer usage history, leaves IGT with little doubt that Hadden download and misappropriated IGT's trade secrets.

109. For example, on September 12, 2017, while attending an external conference, Hadden told Melissa Pursley that he applied for a new position outside IGT.

110. Moreover, in mid-October, Hadden told Jessica Norris, another IGT Indiana employee, that he had reviewed Camelot's bid for the Illinois lottery.

111. These conversations suggest to IGT that, by early September 2017, Hadden applied for and was offered the job with Camelot Illinois.

112. The timing of this offer and Hadden's acceptance is consistent with Camelot's acquisition of this contract.

113. Indeed, during the summer of 2017, it was announced that Camelot had won the bid for the LMA for the Illinois Lottery. By mid-October 2017, the Illinois legislature confirmed it had no objections with Camelot securing the LMA contract. Moreover, Hadden frequently would comment on where Camelot was in the bid process, and, after Camelot won the bid,

Hadden told certain IGT employees that he was not surprised that it won.

114.    Because the transition from IGT to Camelot was effective as of January 1, 2018, it is highly likely that Camelot began interviewing for its COO-level position by mid-2017.

115.    While IGT is particularly concerned that Hadden is using its trade secret and confidential information to allow Camelot to streamline and more effectively operate the Illinois Lottery, it is equally concerned that Hadden will use his knowledge of IGT's strategic plans to help Camelot form bids and compete against IGT in markets other than Illinois in the upcoming months and years.

**EFFECT OF HADDEN'S EMPLOYMENT WITH CAMELOT**

116.    With the departure of Hadden and his knowledge of IGT's confidential information, IGT stands to lose millions of dollars in business and the loss of value of its goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

117.    By definition of his position with Camelot, Hadden is, directly and indirectly, competing against IGT and has used or will use confidential and trade secret IGT information to do so.

118.    Camelot's decision to hire Hadden to lead its Illinois and U.S. operations poses harm far beyond just significant monetary losses.

119.    Camelot cannot blindly ignore Hadden's restrictive covenants to which he is bound, place Hadden in the same position, require him to perform the same duties and responsibilities, task him with competing for business against IGT—all of which constitutes an express breach of his Agreement—and then benefit from his breach.

120.    Camelot has received an unfair advantage in targeting IGT's customers, developing marketing plans and campaigns based on IGT's successes and rejected plans, in

determining what new products and services to develop or not develop, and in developing sales and marketing and operational strategies based on IGT's trade secrets. Defendants will have valuable know-how on how to design and improve Camelot's own products and services, customer relationships, and goodwill, based on misappropriation of IGT's trade secrets and Hadden's breach of his non-compete agreement.

121.    Hadden cannot perform his job for Camelot without violating his Agreement and without using IGT's trade secrets and confidential information.

122.    All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to IGT, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to its reputation as an industry leader and its ability to successfully market its goods and services. Remedies at law are inadequate and cannot make IGT whole.

**COUNT I**
**BREACH OF CONTRACT**
**Against Hadden**
**(Rhode Island Law)**

123.    IGT hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 122.

124.    The Agreement that Hadden entered into with GTECH (now known as IGT), constitutes a valid and enforceable contract.

125.    IGT performed all of the duties and obligations it agreed to and owed Hadden under his Agreement.

126.    The post-employment activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect IGT's legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill

24

and other legitimate business interests.

127. Hadden breached and continues to breach his post-employment contractual obligations owed to IGT by taking competitive employment with an IGT competitor.

128. Hadden breached and continues to breach his post-employment contractual obligations owed to IGT by misusing its confidential and proprietary information.

129. As a result of Hadden's breaches of contract, IGT has been irreparably injured, and it continues to face irreparable injury. It is threatened with losing the value of its confidential and proprietary information, customer relationships, as well as income and goodwill, for which a remedy at law is inadequate.

130. Accordingly, the Defendants must be enjoined and restrained by Order of this Court. To the extent a remedy at equity is adequate, IGT also seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

**COUNT II**
**ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS**
**(ILLINOIS UNIFORM TRADE SECRET ACT)**
**Against Defendants**

131. IGT hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 122.

132. IGT's confidential and proprietary information includes, *inter alia*, IGT's operations, products, pricing formulae, research and development activities, analysis of competitive products, marketing plans, business plans, business strategies, and IGT's customers, including, but not limited to, customer preferences, strategies for soliciting prospective customers, pricing information, analytical results of competitive service comparisons, customer marketing data and purchasing patterns, and planned research and development for its customer

25

base.

133.    This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because IGT derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

134.    Hadden actually misappropriated IGT's trade secrets without its consent, in violation of Illinois law. Camelot and Camelot Illinois cannot hire IGT's employees, including Hadden, into similar positions at Camelot without Defendants utilizing and disclosing IGT's confidential information.

135.    Specifically, Hadden is using and disclosing IGT's trade secrets relating to its lottery management strategies and operations, game development, strategic targets, and marketing efforts, all information of which he received based on his IGT employment.

136.    Defendants are being unjustly enriched by Hadden's misappropriation of IGT's trade secrets and/or confidential information and Camelot and Camelot Illinois's further use of such trade secrets, and, unless restrained, Defendants will continue to use, divulge, and otherwise misappropriate its trade secrets and confidential information.

137.    Defendants' actual misappropriation has been willful and malicious. Further, Hadden violated his Agreement by taking and utilizing IGT's trade secrets and confidential information and refusing to return such information upon IGT's demand.

138.    As a result of the actual misappropriation of IGT's trade secrets, IGT has been injured and faces irreparable injury.

## COUNT III
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *et seq.*

139.    IGT hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 122.

140.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

141.    Hadden acquired IGT's trade secrets by improper means and without authorization. In particular, Hadden obtained trade secrets from IGT through, *inter alia*, having accessed and retained IGT's confidential information and trade secrets even after his resignation. As discussed in length above, IGT's forensic review identified multiple external devices onto which IGT's trade secret information was stored and, which Hadden has not returned, despite repeated requests to do so.

142.    Upon information and belief, Hadden has also disclosed IGT's trade secrets to Camelot and/or Camelot Illinois in violation of his obligations under the Agreement and/or has or threatens to misappropriate IGT's trade secrets in violation of the DTSA.

143.    The information that Hadden has, upon information and belief, provided to Camelot or Camelot Illinois or threatens to provide to them regarding IGT's strategic plans and research and development plans constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its

disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

144. As detailed above, IGT takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

145. Hadden knew or should have known that IGT's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by IGT at great expense and effort; (d) are maintained as confidential and are not generally available to the public or IGT's competitors; (e) would provide significant benefit to a competitor seeking to compete with IGT; and (f) are critical to IGT's ability to conduct their businesses successfully.

146. As detailed above, Hadden transferred and/or wrongfully obtained and accessed IGT's trade secrets and failed to return IGT's information, despite repeated requests from IGT for him to do so.

147. As detailed above, Hadden actively continued gathering IGT's trade secrets even while he was in the process of obtaining employment with Camelot. In fact, even after announcing his departure from IGT, Hadden nevertheless continued to download IGT's trade secrets to external media devices. The only purpose for Hadden to obtain and retain IGT's trade secrets is to use them to compete against IGT on behalf of Camelot and Camelot Illinois.

148. By disclosing and/or threatening to disclose IGT's trade secrets to Camelot and Camelot Illinois without IGT's consent, Hadden has misappropriated or threatens to misappropriate IGT's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

149. The information that Hadden has misappropriated or threatens to misappropriate describes and relates to IGT's highly confidential research and development plans, which

involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

150.     Should Hadden continue to disclose or threaten to disclose IGT's trade secrets, the disclosure of such information will harm IGT and its legitimate business interests.

151.     If information pertaining to IGT's trade secrets are disclosed to Camelot, Camelot Illinois, or other competitors of IGT, it could destroy IGT's competitive advantage.

152.     Because Hadden's misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, IGT request that this Court grant injunctive relief against Hadden from actual or threatened disclosure or utilization of IGT's trade secrets, in addition to granting IGT its attorneys' fees and exemplary damages.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
### Against Camelot and Camelot Illinois

153.     IGT hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 122.

154.     As set forth above, the Agreement is a valid and enforceable contract. The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect IGT's legitimate protectable interests in its long-standing, well established and valuable customer relationships and its confidential information, as well as its goodwill.

155.     Camelot and Camelot Illinois were fully aware of the Agreement prior to hiring and/or continuing to employ Hadden.

156.     Despite having knowledge of the Agreement, Camelot and Camelot Illinois intentionally induced, permitted or incentivized Hadden to violate the post-employment and contractual obligations owing to IGT, without justification, in an effort to employ him, move IGT's customers and/or workforce, and/or unfairly compete with IGT.

29

157.    IGT believes Camelot's and Camelot Illinois's intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Hadden to breach his contract with IGT and otherwise violate the law.

158.    Camelot's and Camelot Illinois's interference with the Agreement is separate and apart from, and unrelated to, their threatened and/or actual misappropriation of IGT's trade secrets.

159.    As a result of Camelot's and Camelot Illinois's intentional interference, IGT has suffered irreparable and other significant injuries.

**COUNT V**
**UNFAIR COMPETITION**
**(All Defendants)**

160.    IGT hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 122.

161.    Defendants took the actions described above to gain an unfair competitive advantage over IGT.

162.    Defendants willfully and maliciously took the actions described above with knowledge of and disregard for IGT's rights, and with the intention of causing harm to IGT for their own benefit.

163.    As a result of Defendants' actions, Defendants are unfairly competing in the LMA lottery marketplace.

164.    IGT has been irreparably injured and it continues to face irreparable injury. IGT is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

165.     Accordingly, the Defendants must be enjoined and restrained by Order of this Court. In addition to a remedy at equity, IGT seeks actual, incidental, compensatory, punitive, and consequential damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, IGT seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.     Preliminarily and permanently enjoins Defendant Colin Hadden, and all parties in active concert or participation with him, from using or disclosing any of IGT's confidential, proprietary and/or trade secret information;

B.     Preliminarily and permanently enjoins Defendant Colin Hadden from holding any position with Camelot or Camelot Illinois.

C.     Preliminarily and permanently enjoins Defendant Colin Hadden from having any responsibilities for lottery at Camelot.

D.     Preliminarily and permanently enjoins Defendant Colin Hadden, and all parties in active concert or participation with him or receiving notice of any injunction, from contacting, soliciting, or moving the business of any current or prospective customer of IGT;

E.     Orders Defendant Colin Hadden and all parties in active concert or participation with him to return to IGT all originals and copies of all files, devices and/or documents that contain or relate to IGT's confidential and proprietary information, including without limitation, all computers, electronic media, PDAs and electronic storage devices;

F.     Orders Defendant Colin Hadden to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by Hadden;

G.     Awards IGT actual, incidental, compensatory, and consequential damages to be proven at trial;

H.     Awards IGT exemplary or punitive damages in an amount to be proven at trial due to Defendants' outrageous, willful and/or malicious activities;

I.     Awards IGT its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Illinois Trade Secrets Act and/or Defend Trade Secrets Act;

J.     Orders IGT to receive all sums disgorged from Hadden; and

K.      Orders IGT such further relief as the Court deems necessary and just.

DATED: JANUARY 22, 2018          Respectfully submitted,

**IGT GLOBAL SOLUTIONS CORPORATION**

By: /s/ Justin K. Beyer_____
                    One of Its Attorneys

Michael D. Wexler (mwexler@seyfarth.com)
Justin K. Beyer  (jbeyer@seyfarth.com)
Robyn E. Marsh (rmarsh@seyfarth.com)
SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

*Attorneys for Plaintiff IGT Global Solutions Corporation*